**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| LARRY HARVEY, WALTER BENNETT, CAMERON THRALL, AND JON NOLAN, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. ___1:20-cv-134___ |
| LIFE SPINE, INC. | ) ) ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) ) ) ) ) ) | |

## COMPLAINT FOR DAMAGES

Plaintiffs Larry Harvey, Walter Bennett, Cameron Thrall, and Jon Nolan file this Complaint for Damages against Life Spine, Inc. ("Life Spine" or "the Company"), and allege as follows:

### INTRODUCTION

1.     This is an action for retaliatory discharge in violation of the False Claims Act, 31 U.S.C. § 3730(h), and the common law of Illinois.

2.     From at least January 2012 through December 2018, defendant Life Spine engaged in an extensive kickback scheme in which the company paid surgeons, ostensibly for consulting fees, royalties, and intellectual property acquisition fees, but in reality to induce those surgeons to

use Life Spine's products. Life Spine paid millions of dollars to surgeons, meticulously tracking their use of Life Spine products. This caused false claims for payment to be made to Medicare and Medicaid.

3. Life Spine has admitted to much of this wrongful conduct. In a False Claims Act case originally brought by the Plaintiffs here and later taken over by the United States, Life Spine admitted that it paid surgeons, tracked their use of Life Spine products, and encouraged the paid surgeons to use Life Spine products as a way to achieve return on its investment. Life Spine also agreed to the entry of a consent judgment requiring Life Spine to pay the United States $5.5 million.

4. Each of the Plaintiffs in this case was employed by Life Spine while the company was engaged in these illegal activities. Each Plaintiff also objected to the company's illegal kickback scheme. And, shortly after complaining about Life Spine's activities and/or requesting copies of the company's payment agreements to support a federal or state false claims action, each of the Plaintiffs was abruptly terminated from employment.

5. Defendant's malicious and retaliatory termination of the Plaintiffs violated the federal False Claims Act, as well as Illinois law, and caused each Plaintiff significant damages.

## PARTIES

6. Plaintiff Larry Harvey is a resident of New Mexico. He was employed as a sales representative of Life Spine from April 15, 2016 to January 11, 2017, when his employment was abruptly terminated after he complained that Life Spine's kickback scheme violated the law.

7. Plaintiff Walter Bennett is a resident of Virginia. He was employed as an Area Vice President of Sales of Defendant Life Spine from August 16, 2017, until December 23, 2018,

when he was terminated shortly after he reported Life Spine's unlawful payments to surgeons, and refused to attend meetings with surgeons to discuss illegal consultant agreements.

8.      Plaintiff Cameron Thrall is a resident of the State of Washington.  He was employed by Life Spine from February 1, 2017, until late 2017, when he was terminated shortly after expressing concerns over Life Spine's payments to surgeons and requesting a copy of one of the agreements codifying those arrangements.

9.      Plaintiff Jon Nolan is a resident of Ohio.  He was employed by Life Spine from August 1, 2016, until July 14, 2017, when he was terminated shortly after expressing concerns that Life Spine's payments to surgeons were illegal.

10.      Defendant Life Spine, Inc., was incorporated in Delaware on May 21, 2002, and has its principal place of business in Huntley, Illinois. Life Spine manufactures, designs, develops, and markets implants and instruments, including medical devices and technologies, used in the treatment of spinal diseases.

## JURISDICTION AND VENUE

11.      Jurisdiction is proper in this Court under the provision for federal questions (28 U.S.C. § 1331), namely, the False Claims Act's anti-retaliation provision, 31 U.S.C. § 3730(h). This Court has pendent jurisdiction over the Plaintiffs' state law claims for retaliatory discharge.

12.      This Court has diversity jurisdiction under 28 U.S.C. § 1332 because the Plaintiffs and the Defendant are citizens of different states and the amount in controversy exceeds $75,000. Plaintiff Larry Harvey is a resident of New Mexico.  Plaintiff Walter Bennett is a resident of Virginia.  Plaintiff Cameron Thrall is a resident of the State of Washington.  And Plaintiff Jon Nolan is a resident of Ohio.  Defendant is incorporated in Delaware and has its principal place of business in Illinois.

3

13.     This Court has personal jurisdiction over Defendant because Defendant maintains its corporate headquarters within the Northern District of Illinois.

14.     Venue is proper under 28 U.S.C. § 1391(e)(1)(B) because Defendant maintains its corporate headquarters in this District and because a substantial part of the events or omissions giving rise to the claim occurred here.

## FACTS

### Life Spine's Kickback Scheme

15.     Defendant Life Spine manufactures, markets, and sells a variety of medical devices and products relating to spine surgery.  From at least January 2012 through December 2018, Defendant engaged in a variety of fraudulent activities involving its medical spine-device products.

16.     Life Spine offered and paid millions of dollars in consulting fees, royalties, and intellectual property acquisition fees, to surgeons to induce them to use Life Spine's spinal implants, devices, and equipment.

17.     Defendant aggressively recruited surgeons who had the potential to use a high volume of Life Spine products to enter into agreements to serve as paid "consultants" and/or to transfer their patents/patent applications to Life Spine in exchange for payments and promises to bring the surgeons' new products to market.

18.     Life Spine senior executives recruited surgeons by inviting them  (either directly or through Life Spine's sales or marketing staff) to visit Life Spine's headquarters for training sessions or meetings, or by taking the surgeons out to dinners, after which they would discuss the terms of potential agreements in private meetings.

19.     Life Spine entered into agreements with dozens of surgeons (the "Paid Surgeons") pursuant to which the surgeons received compensation from Life Spine. These agreements included:

a.  "Medical education" consulting agreements under which Life Spine paid an hourly rate (typically $500 per hour) to provide training and/or educational services. These services included, among other things, speaking about Life Spine products, preparing research papers related to Life Spine products, presenting at trade shows or conferences, participating in clinical studies of Life Spine products, and training Life Spine's staff;

b.  Product development agreements pursuant to which Life Spine hired surgeons as consultants to advise on specific new products in the development stage, and paying the surgeons an hourly rate (typically $500 per hour); and

c.  Intellectual property agreements in which Life Spine purchased or licensed patents or patent applications obtained by surgeons. The company paid surgeons up-front fees, in some cases hundreds of thousands of dollars, and royalties (typically 5-7% of net sales) on any products developed based on the patents.

20.     Life Spine used these agreements to funnel payments to surgeons to induce them to use Life Spine products in their surgeries. Life Spine managers frequently advised surgeons that they were expected to commit to using a certain amount of Life Spine products in exchange for the consulting fees, royalties, and intellectual property acquisition fees paid to them. In fact, many surgeons started using Life Spine products only after receiving payments from the company.

21.     Life Spine closely tracked Paid Surgeons' usage of Life Spine products to ensure that the payments were cost effective – that they were generating sufficient sales revenues for the company. If a Paid Surgeon's usage was too low, company officials pressured the surgeon to use

more Life Spine products during his or her surgeries, often reminding the surgeon that the company expected a certain amount of usage in exchange for its payments.

22.    Life Spine's kickback scheme paid off considerably.  While Paid Surgeons were only a small fraction of Life Spine's customers, they accounted for roughly half of Life Spine's total domestic sales of spinal products from 2012 to 2018.

23.    All told, Life Spine paid more than $7 million in consulting fees, royalties, and intellectual property acquisition payments to Paid Surgeons. Life Spine did not report all of these payments to the Centers for Medicare and Medicaid Services ("CMS"), in violation of the Physician Payment Sunshine Act, 42 U.S.C. § 1320a-7h.

24.    These surgeons used Life Spine products during procedures performed on Medicare and Medicaid patients.  This resulted in the submission of kickback-tainted false claims to Medicare and Medicaid.

### The Qui Tam Complaint And Settlement

25.    On February 14, 2018, Plaintiffs in this action, acting through BNHT LLC to protect their identities, filed a complaint in the United States Court of Appeals for the Southern District of New York against Defendant Life Spine and two of its officials:  its owner and founder Michael Butler and its Executive Vice President of Sales Joseph Loy.  *See United States, et al. ex rel. BNHT LLC v. Life Spine, Inc., et al.*, S.D.N.Y. No. 18-cv-1131 (JSR).

26.    The relators' complaint alleged that the defendants had engaged in an illegal kickback scheme in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and the false claims statutes of 13 states and the District of Columbia.  The complaint also alleged that three of the four relators (Harvey, Bennett, and Thrall) had been unlawfully terminated in retaliation for their attempts to stop Life Spine's illegal conduct, in violation of the Federal False

6

Claims Act, 31 U.S.C. § 3730(h), as well as several state statutes, including the Illinois False Claims Whistleblower Reward and Protection Act, 740 ILCS 175/4(g).

27.　　On July 25, 2019, the United States intervened in the action pursuant to 31 U.S.C. § 3730(b)(4). The government's complaint alleged that Life Spine and two of its officers, Michael Butler and Richard Greiber, had engaged in an extensive kickback scheme to pay surgeons for the use of Life Spine's products.

28.　　The United States alleged that these actions violated the False Claims Act, specifically the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and thereby caused false claims for payment to be submitted to and paid by Medicare and Medicaid.

29.　　On October 23, 2019, Life Spine entered into a Stipulation and Order of Settlement and Dismissal with the United States and the relators. (Ex. A, Stipulation and Order of Settlement and Dismissal, *United States ex rel. BNHT, LLC v. Life Spine Inc.,* et al., No. 18-Civ-1311 (JSR) (SDNY, Oct. 23, 2019) ("Stipulation").) The Stipulation provides that Life Spine "admits, acknowledges, and accepts responsibility for" numerous acts, including among others:

a. Life Spine entered into agreements with dozens of Paid Surgeons pursuant to which the surgeons received compensation from Life Spine;

b. Life Spine paid surgeons more than $7 million in consulting fees, royalties, and intellectual property acquisition payments, after which most of the surgeons receiving payments substantially increased their usage of Life Spine products;

c. Approximately half of Life Spine's domestic sales of spinal products from January 2012 through December 2018 were attributable to surgeries performed by surgeons who received consulting fees, royalties, and intellectual property acquisition payments from Life Spine;

7

d.  Life Spine closely tracked the usage of Life Spine products by surgeons who received payments, generated reports for management that reflected both the payments made to surgeons and the surgeons' usage of Life Spine products during a given time period, and referenced Life Spine's "ROI" (return on investment) by dividing the sales revenue associated with each surgeon's usage of Life Spine products by the total amount paid to that surgeon in consulting fees and royalties during the same period;

e.  When surgeons' usage decreased, senior Life Spine sales managers contacted the surgeons, or their distributors, to urge the surgeons to more frequently use Life Spine products; and

f.  Life Spine did not have effective systems in place to ensure that the company's relationships with surgeons complied with applicable laws and regulations, including the Anti-Kickback Statute.

30.  The Stipulation also provided that Life Spine, "having truthfully admitted to the conduct set forth" above, "agrees that it shall not, through its attorneys, agents, officers, or employees, make any public statement, including but not limited to any statement in a press release, social media forum, or website, that contradicts or is inconsistent with the Admitted Conduct or suggests that the Admitted Conduct is not wrongful." (Ex. A, ¶ 16.)

31.  As a result of the Stipulation, Life Spine agreed to the entry of a consent judgment in favor of the Government and against Life Spine in the amount of $5,500,000. (Ex. A, ¶ 4; *see also* Ex. B, Consent Judgment, *United States ex rel. BNHT, LLC v. Life Spine Inc.,* et al., No. 18-Civ-1311 (JSR) (SDNY, Nov. 6, 2019) ("Judgment").)

32.  As part of the Stipulation, the relators released Life Spine, as well as its officers, agents and employees, from any and all claims arising out of the relator's complaint, "provided, however, that nothing in this Stipulation shall preclude the Relators from seeking to recover their

8

reasonable expenses and attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d) or seeking relief for the claims asserted in the Relator Complaint alleging unlawful retaliation pursuant to 31 U.S.C. § 3730(h)." (Ex. A, ¶ 9.)

33.     The individual defendants also entered into stipulated settlements as follows:

a.  Butler admitted that he had been involved in identifying and retaining some of the surgeons who served as paid consultants and had been involved in some of the negotiations for IP Purchase Agreements with surgeons. He also admitted that he received reports showing the payments to surgeons and those surgeons' use of Life Spine products, and that when those surgeons' use decreased, he would contact the surgeons or their distributors to encourage them to increase their usage of Life Spine products. Butler agreed to pay $375,000.00 plus interest.

b.  Greiber admitted the he was involved in negotiating and reviewing the terms of Life Spine's Intellectual Property Purchase Agreements with surgeons, conversations tying the IP agreement to the surgeon's use of Life Spine products, and failing to develop and implement effective systems to ensure that the company's relationships with surgeons complied with applicable laws and regulations. He agreed to pay $115,000.00.

34.     The settlement of the *qui tam* action did not address the relators' retaliation claims. On November 20, 2019, relators dismissed the action, intending to file their retaliation claims in this Court.

## Life Spine's Retaliatory Termination of Larry Harvey

35.     During 2016, Plaintiff Larry Harvey was a sales representative at Life Spine, covering the Southwest Region.

36.     Mr. Harvey repeatedly brought his concerns about Life Spine's conduct to Life Spine executives.  For example, Mr. Harvey and Life Spine Executive Vice President of Sales Joseph Loy met on November 30, 2016, with a distributor to discuss the terms of the distributor's contract.  At the meeting, Loy described the involvement of a particular doctor who had a consulting contract with Life Spine.  Loy explained that the surgeon's involvement in the program was renewable annually, so long as the surgeon used $2 million worth of Life Spine products and provided a weekly surgery schedule to Life Spine.

37.     Immediately after the meeting, Mr. Harvey objected to Loy's description of the consulting program, which appeared to tie consulting relationships with sales.  He further told Loy that doing so was illegal.

38.     On December 10, 2016, Mr. Harvey and Loy met with a second distributor (Max Spine LLC) to discuss a particular doctor's arrangement with Life Spine.  Loy stated that the surgeon's involvement in the program required monthly sales volume of $150,000, and confirmation of sales by delivery of the doctor's surgery schedule each week.  The Max Spine representative replied that he would not send surgery schedules to Life Spine because it was inappropriate.  Max Spine subsequently sent a letter to Loy explaining that it would not do business with Life Spine, noting among other things that Loy had "clearly stepped over the line" in requiring the surgeon "do more volume for the company because Life Spine was engaging him." (*See* Ex. C, Letter from Adam Martin to Joseph Loy (Feb. 22, 2017).)

39.     On December 12, 2016, Mr. Harvey discussed the Max Spine surgeon's December 10 visit with Loy.  During that conversation, Mr. Harvey again expressed his concerns to Loy that describing the consulting program in terms of sales requirements for surgeons was improper.  Loy responded that he did not believe it was a problem.

40.     Mr. Harvey complained again in a telephone call on or about January 10, 2017, and just before Life Spine's national meeting.  During the call, Loy expressed the view that Mr. Harvey's territory was going to do very well.  In addition, Loy included in Mr. Harvey's sales quotas for the coming year sales from two surgeons with consulting agreements.  At that time, Mr. Harvey stated to Loy that it was inappropriate to include those presumed sales in the quota, that it was improper to pay surgeons and to tie those payments to the number of surgeries with Life Spine products, and that doing so put Life Spine at legal risk.

41.     The next morning, January 11, 2017, Mr. Loy, along with Kara Hoehn, Life Spine's Manager of Human Resources, called Mr. Harvey and informed him that he was being terminated.  At that time, Mr. Harvey stated to them that he believed his firing was due to his complaints about paying doctors.

42.     The same day, Loy sent an email to other sales representatives at Life Spine stating that Harvey "is no longer an employee at Life Spine." The email went on to state: "Disrespect to fellow teammates and insubordination will not be tolerated."  A copy of this email is attached hereto as Ex. D (Email from Loy to Multiple Recipients (Jan. 11, 2017)).

43.     Life Spine terminated Mr. Harvey's employment in retaliation for his objection to Life Spine's illegal kickback scheme.  Had Mr. Harvey not objected to Life Spine's illegal activities, he would not have been fired.

44.     As a result of Life Spine's retaliatory discharge, Mr. Harvey was unemployed for four and one-half months, losing approximately $48,500 in salary.  In addition, Life Spine failed to pay Mr. Harvey reimbursement for expenses he had incurred of approximately $6,000.

### **Life Spine's Retaliatory Termination of Walter Bennett**

45.     Plaintiff Walter Bennett was the Life Spine Area Vice President of Sales for the Northeast Region beginning August 16, 2017.  At all times during his employment, Mr. Harvey's immediate supervisor was Mariusz Knap, Life Spine's Vice President of Sales.

46.     At all times during his tenure at Life Spine, Mr. Bennett's performance was excellent.  He signed up 26 distributors in November 2018, breaking the company one-month record.  He also signed up $85,000 in business in November 2018.

47.     While employed at Life Spine, Mr. Bennett was pressured repeatedly to participate in Life Spine's practice of signing up surgeons for consulting and other agreements.  On numerous occasions Mr. Bennett told Knap, his supervisor, that he was uncomfortable being involved in sales meetings with surgeons that also included discussions about potential consulting agreements.  Mr. Bennett repeatedly told Knap that those agreements were illegal.

48.     For instance, on two occasions in October 2017 Knap ordered Mr. Bennett to go to Rhode Island to meet with a surgeon to discuss the potential purchase of the surgeon's neuro-monitoring company as well as the surgeon's use of Life Spine products.  Mr. Bennett explained to Knap that he would not meet with the doctor because he was not comfortable attending meetings to discuss illegal consultant opportunities.

49.     In November 2017, Mr. Bennett declined to attend a meeting with a surgeon in Kentucky to discuss both a consulting arrangement and the surgeon's use of Life Spine products.  Mr. Bennett again informed Knap that he was uncomfortable attending meetings to discuss quid pro quo consulting opportunities.

50.     Mr. Bennett also declined to attend a lunch meeting in Newport News, Virginia, set for December 15, 2017.  As with the other meetings, Mr. Bennett told Knap that he was not comfortable participating in Life Spine's illegal conduct.

51.     On December 20, 2017, Mr. Bennett again told Knap that Life Spine's payments to surgeons were illegal.  At that time, Mr. Bennett declined to attend a meeting in New York City with a group of surgeons to discuss consultant opportunities.

52.     Mr. Bennett also expressed his concern about Life Spine's illegal conduct to Colleen Kathe, Life Spine's Associate Manager of Marketing.  In early December 2017, in an attempt to get more information to further a potential False Claims Act action, Mr. Bennett asked Ms. Kathe why the consultant folder on Life Spine's computer system was restricted.  On the same day, Mr. Bennett also asked Life Spine Director of Operations Jenn Jesse for access to the consultant agreement folder.

53.     Shortly after these inquiries about Life Spine's illegal activities, and on December 23, 2017, Knap and Life Spine Human Resources Manager, Kara Hoehn, called Mr. Bennett and informed him that he was being terminated from employment.

54.     Mr. Bennett was fired despite bringing substantial business to Life Spine. Moreover, he was fired after clearly indicating that he believed unlawful activity was occurring and attempting to get a copy of a consulting agreement.

55.     Life Spine terminated Mr. Bennett's employment in retaliation for his objections to and inquiries about Life Spine's illegal kickback scheme. Had Mr. Bennett not objected to Life Spine's illegal activities, he would not have been fired.

13

56.     As a result of his firing, Mr. Bennett was out of work from December 23, 2017 to March 7, 2018, losing approximately $26,000 in salary.  Mr. Bennett also lost a bonus of $4,250 that would have been due to him had he not been fired.

57.     In addition, Mr. Bennett's new job, which he held from March 7, 2018 until January 4, 2019, paid him less than his salary at Life Spine, resulting in additional lost wages of approximately $8,000.

58.     Finally, as a result of Life Spine's vindictive firing of Mr. Bennett two days before Christmas, Mr. Bennett suffered significant emotional distress for which he is entitled to compensation.

### Life Spine's Retaliatory Termination of Cameron Thrall

59.     Plaintiff Cameron Thrall was employed as Life Spine's Regional Manager of the Northwest Region beginning on February 1, 2017.

60.     Shortly after he began work at Life Spine, Mr. Thrall realized that the company routinely used payments to surgeons through consulting and other agreements to increase sales of Life Spine products, tying these payments to the surgeons' use of those products.  With the understanding that these activities were illegal, Mr. Thrall inquired into evidence to support a False Claims Act suit against Life Spine.

61.     In September 2017, Mr. Thrall spoke with Walter Bennett.  Both men realized that Life Spine's practices were illegal and that they both were independently inquiring into supporting evidence.

62.     Late in 2017, in an attempt to find such evidence, Mr. Thrall asked Colleen Kathe, a Life Spine Marketing Manager, for a copy of the consulting agreement Life Spine used with surgeons.  Kathe refused to provide a copy.

63.     Four days after asking Kathe for a copy of the consulting agreement, Mr. Thrall's supervisor, Mariusz Knap, called Thrall and informed him that Life Spine was terminating his employment.

64.     Life Spine terminated Mr. Thrall's employment in retaliation for his objection to Life Spine's illegal kickback scheme. Had Mr. Thrall not objected to Life Spine's illegal activities, he would not have been fired.

65.     As a result of Life Spine's actions, Mr. Thrall was unemployed for 5 weeks, losing approximately $14,807 in wages.

66.     Mr. Thrall, who had been working in the spine-related medical device industry for 2 years, reluctantly found a new job as a sales representative for a pacemaker company on December 7, 2018. He continued to seek other management opportunities in the spine-related medical device industry but was unable to find a job in the industry.

67.     As a result of the emotional toll caused by his termination from Life Spine, Mr. Thrall was forced to leave the health care industry.  His current job outside the industry pays $40,000 per year less than Mr. Thrall's compensation at Life Spine.  As a result, Mr. Thrall continues to suffer damage as a result of Life Spine's retaliatory actions and will continue to do so in the future.

68.     Because of Life Spine's retaliatory actions, Mr. Thrall suffered significant emotional distress for which he is entitled to compensation.

### Life Spine's Retaliatory Termination of Jon Nolan

69.     Plaintiff Jon Nolan is a disabled veteran who was hired as Life Spine's Area Vice President of Sales in the Great Lakes region on August 1, 2016. Despite having three supervisors in less than 12 months, Mr. Nolan is one of very few sales managers that made it to his one-year

employment anniversary. Mr. Nolan approached each of these supervisors with his overall concerns regarding their business practices and lack of corporate compliance policies and training.

70.     During his employment with Life Spine, Mr. Nolan met all of his performance goals and quotas. Based on his strong performance, Mr. Nolan was the only Area Vice President offered stock grants and warrants.

71.     Mr. Nolan began expressing concerns about Life Spine's practices in the spring of 2017. He told Joseph Loy, then the Vice President of Sales, that he was uncomfortable with what appeared to be a "pay to play" system for surgeons using Life Spine's products. On several occasions in or around early 2017, Loy asked Mr. Nolan to inquire why a specific surgeon was not using more of a particular Life Spine product in order to hit his monthly quota. When Mr. Nolan questioned the instruction, Loy told Mr. Nolan to keep his concerns to himself.

72.     In June 2017, Mr. Nolan was involved (along with Loy and Life Spine Production Manager John Gotzon) in signing up a surgeon to help design a deformity system. After a meeting with the surgeon, Loy stated to Mr. Nolan that the company would have to get the surgeon involved with the company's other products in order to create a monthly usage pattern to support a consultancy agreement. Mr. Nolan objected, saying he did not want any part of dangling a potential consulting contract in order to get the surgeon to use Life Spine products. Loy responded that Mr. Nolan need not worry about anything but getting sales from that dinner meeting and the products approved in the surgeon's hospital as soon as possible. Mr. Nolan faced relentless pressure because of the delay in product approval. When Mr. Nolan brought this up again with his new supervisors over the coming months in 2017, he was told it wasn't his business. The account was subsequently taken away from Mr. Nolan and turned into a "house account" such that Mr. Nolan no longer received any credit from sales toward his required quota.

16

73.     Between April and June of 2017, two different employees (Scott Lehigh and Larry Butler) informed Mr. Nolan of potential retaliatory action by supervisors, including but not limited to Loy and Knap.

74.     On or about July 12, 2017, Mr. Nolan arranged a meeting with a particular surgeon. However, Life Spine sales manager Mariusz Knap told Mr. Nolan shortly before the meeting that it had been cancelled. Mr. Nolan later learned that Knap went to the meeting without him.

75.     Mr. Nolan subsequently warned the surgeon to be careful and to make sure any contract he signed with Life Spine was only for services legitimately rendered.

76.     Only a few days after the meeting, on or about July 17, 2017, Life Spine terminated Mr. Nolan's employment.

77.     Life Spine terminated Mr. Nolan's employment in retaliation for his objection to Life Spine's illegal kickback scheme. Had Mr. Nolan not objected to Life Spine's illegal activities, he would not have been fired.

78.     As a result of his firing, Mr. Nolan was unemployed for approximately four months, losing approximately $62,500 in salary.

79.     In an effort to generate income, Mr. Nolan started a consulting company in September 2017. His income from that company was approximately $5,000 per month, after expenses.

80.     Mr. Nolan continues to suffer lost wages as a result of Life Spine's retaliatory action. His current job pays $80,000 less per year than his compensation at Life Spine, resulting in continuing and future damage.

81.     In addition, as a result of Life Spine's action, Mr. Nolan was unable to make the mortgage payments on his house, forcing him to sell his home prematurely and move into an

apartment. After moving into a new home, Mr. Nolan lost a substantial amount in equity as a proximate cause of being forced to sell his home.

82.     Because of Life Spine's retaliatory actions, Mr. Nolan suffered significant emotional distress for which he is entitled to compensation.

## COUNT I

### (Retaliatory Discharge in Violation of the False Claims Act, 31 U.S.C. § 3730(h))

83.     The above paragraphs are incorporated and re-alleged herein.

84.     Plaintiffs were engaged in conduct protected under the False Claims Act, including objecting to, investigating, and reporting Life Spine's kickback scheme in violation of the False Claims Act.

85.     Defendant knew that Plaintiffs were engaged in such protected conduct.

86.     Plaintiffs were terminated from employment because of their involvement in the protected conduct, causing each of them to suffer, and continue to suffer, substantial financial and emotional damage in an amount to be proven at trial.

87.     Accordingly, each Plaintiff is entitled to damages for lost wages, emotional distress, and any other damages to be proven at trial.

88.     In terminating the Plaintiffs, Life Spine acted willfully, with malice, and with wanton disregard for the rights of Plaintiffs.  Accordingly, punitive damages are appropriate.

## COUNT II

### (Retaliatory Discharge in Violation of Illinois Public Policy)

89.     The above paragraphs are incorporated and re-alleged herein.

90.     Under Illinois common law, employees have a right to act in good faith to halt harm to the public and to try to prevent conduct that the employee believes will endanger the public.

18

Disciplinary action, including termination, taken in retaliation for such protected conduct violates public policy and constitutes wrongful retaliation and/or termination.

91.     Life Spine retaliated against each of the Plaintiffs for conduct protected under Illinois common law. Life Spine retaliated because Plaintiffs tried to prevent the sale of and reimbursement for medical devices in violation of federal law.

92.     Life Spine's termination of Plaintiffs violated public policy and constituted wrongful termination. As a result, each of them has suffered substantial financial losses, and substantial emotional distress.

93.     Accordingly, each Plaintiff is entitled to damages for lost wages, emotional distress, and any other damages to be proven at trial.

94.     In terminating the Plaintiffs, Life Spine acted willfully, with malice, and with wanton disregard for the rights of Plaintiffs.  Accordingly, punitive damages are appropriate.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief including the following:

1.  That each Plaintiff be awarded two times his lost wages, as provided in 31 U.S.C. § 3730(h)(2), or for lost wages as provided by Illinois law.

2.  That each Plaintiff be awarded damages for emotional distress.

3.  That each Plaintiff be awarded other compensatory damages.

4.  That Plaintiffs be awarded punitive damages.

5.  Attorneys' fees and costs.

6.  Any such other relief as this Court deems just and equitable.

    Plaintiffs respectfully demand a jury trial.

Respectfully submitted,

/s/ Jeremy Mallory

Jeremy Mallory
MASSEY & GAIL LLP
1000 Maine Ave., SW
Suite 450
Washington, D.C. 20024
(202) 652-4511
jmallory@masseygail.com

Leonard A. Gail
Constance Grieves
MASSEY & GAIL LLP (#45293)
50 East Washington, Suite 400
Chicago, IL 60602
(312) 283-1590
lgail@masseygail.com
cgrieves@masseygail.com

Matthew M. Collette (application for
admission pending)
Massey & Gail LLP
1000 Maine Ave., SW
Suite 450
Washington, D.C. 20024
(202) 652-4511
mcollette@masseygail.com

*Attorneys for Plaintiffs*

Date:  January 7, 2020